# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
NOV 01 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  19MJ4859
)
Facebook, Inc., )
1601 Willow Road, Menlo Park, CA 94025 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960, 963 | Conspiracy to import controlled substances; |

The application is based on these facts:

See attached Affidavit of Special Agent Miriam Marcais

☒ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Miriam Marcais, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/1/19

*Judge's signature*

City and state: San Diego, CA

Hon. Barbara L. Major
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR SEARCH WARRANTS

I, Miriam Marcais, being duly sworn, state as follows:

1. This affidavit is in support of an application by the United States of America for a search warrant for Facebook, Inc. ("Facebook"), as described in Attachment A, to search the following Facebook account for items that constitutes evidence, fruits and instrumentalities of violations of federal criminal law, namely, 21 U.S.C. §§ 952, 960, and 963, as described in Attachment B:

    Facebook Name: "Pete Jr Alonzo"
    Facebook ID No.: 100003184530570
    Facebook URL: www.facebook.com/pedro.alonzo.100
    (hereinafter, "**Target Account**"),

utilized by Pedro Alonzo-Ramirez between June 1, 2018 and September 22, 2018.

2. The information contained in this affidavit is based on my personal experience and training, consultation with other special agents and other law enforcement officers. Because this affidavit is submitted for the limited purpose of securing a search warrant as described herein, it does not include every fact known to me concerning the investigation.

## EXPERIENCE & TRAINING

3. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") and have been so employed since November 2009. I am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7). I am a graduate of the Criminal Investigator Course and Immigration and Customs Enforcement, Special Agent Training Program at the Federal Law Enforcement Training Center. I have a Master's Degree in International Relations from the University of Chicago and a Bachelor's Degree in Political Science from Virginia Wesleyan College. I am presently assigned to the national security group in San Diego, CA. My duties include investigating the illicit trafficking of controlled substances into the United States of America. I am also cross designated by the United States Drug Enforcement Administration ("DEA") to conduct narcotics investigations and enforce the provisions of the Federal Controlled Substance Act.

4. As an HSI Special Agent, my duties include investigating the illegal importation and trafficking of controlled substances. I have received training in investigating various controlled substances, including the importation of controlled substances and controlled substance trafficking. I have also had training in the methods used by controlled substance traffickers to import and distribute drugs and to operate detailed distribution networks. Since becoming an HSI Special Agent, I have been involved in over one hundred narcotics trafficking investigations involving the importation, distribution and sale of large quantities of controlled substances. I have also worked with and conferred with other agents with extensive experience in narcotics smuggling investigations. In the course of my duties, I have worked as the case agent, directing specific drug-related investigations; I have worked as a co-case agent, assisting in the investigation of drug-related investigations, I have worked as a surveillance agent and observed and recorded movements of individuals trafficking in drugs and of those suspected of trafficking in drugs; I have participated in the execution of search warrants; I have initiated and conducted international and domestic controlled deliveries of narcotics, I have initiated and executed numerous arrests for drug-related offenses, including possession with the intent to distribute and the importation of controlled substances; and I have interviewed defendants, witnesses and informants relating to the illegal trafficking of controlled substances. Through my observations and these interviews, I have gained a working knowledge and insight into the normal operational habits of narcotics smugglers, with particular emphasis on those who attempt to import narcotics into the United States from Mexico at the San Diego international ports of entry.

5. Through the course of my training, investigations and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involving narcotics smuggling generate many types of evidence including, but

not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names and contact information for co-conspirators, photographs, text messages, emails, messages from text messaging cell phone applications such as WhatsApp, social networking messages, and videos reflecting co-conspirators or illegal activity.

6. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations. The facts and conclusions set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation; my review of documents and records related to this investigation; communications with others who have personal knowledge of the events, details, and circumstances described herein; and information gained through my training, experience, and communications with colleagues. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. Dates, times, and amounts are approximate.

## FACEBOOK, INC.

7. Facebook, Inc. is an Internet company which, among other things, provides electronic communication services to its subscribers. Facebook's electronic mail/communication service allows Facebook subscribers to communicate and share with other Facebook subscribers and with others through the Internet. Facebook subscribers access Facebook's services through the Internet.

8. Subscribers to Facebook use screen names during communications with others. The screen names may or may not identify the real name of the person using a particular screen name. Although Facebook requires users to subscribe for a free Facebook account, Facebook does not verify the information provided by the Facebook subscriber for its free services.

9. At the creation of a Facebook account and for each subsequent access to the account, Facebook logs the Internet Protocol ("IP") address of the computer accessing the account. An IP address is a unique address through which a computer connects to the Internet. IP addresses are leased to businesses and individuals by Internet Service Providers. Obtaining the IP addresses that have accessed a particular Facebook account often identifies the Internet Service Provider that owns and has leased that address to its customer. Subscriber information for that customer then can be obtained using appropriate legal process.

10. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

11. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

12. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News

Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

13. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

14. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

15. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user

that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

16. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

17. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

18. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

19. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

20. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

21. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

22. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

23. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

24. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

25. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

26. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user

views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

27. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

28. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic

context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

29. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

30. Moreover, Facebook users that are not friends are generally not precluded from communicating with one another. Depending on a user's specific settings, certain aspects of a Facebook profile may be publicly viewable, while other portions may be restricted to certain persons or friends of the Facebook user's accounts. These so-called "privacy" settings are set by each individual user. Based on my experience, not every Facebook account is by default restricted from public access. And while users can post messages and comments on other users' Facebook pages, Facebook also allows a private messaging function wherein messages are shared only between the users that are part of that conversation or messaging thread.

31. Based on my training and experience, Facebook Messenger is a cellphone app created by Facebook, Inc. to enable text-based and audio communications between

Facebook users. Facebook users utilize their Facebook logins to access their accounts and to communicate with their Facebook friends or other Facebook users much the same way a Facebook user can communicate with other users on the Facebook website.

## STATEMENT OF PROBABLE CAUSE

32. On September 22, 2018, at approximately 02:05 hours, Peter ALONZO, a United States citizen, and Pedro ALONZO RAMIREZ, a lawful permanent resident, applied for entry into the United States from Mexico through the Otay Mesa, California, Port of Entry (POE) in the vehicle lanes. Peter ALONZO was the driver and registered owner of a grey 2017 Nissan Sentra bearing California license plates 7XUP053 ("the vehicle"). Pedro ALONZO RAMIREZ was the passenger in the vehicle and the son of Peter ALONZO.

33. U.S. Customs and Border Protection Officer ("CBPO") A. Ackley conducted the primary inspection of the vehicle. Peter ALONZO told CBPO Ackley that his intended destination within the United States was Los Angeles, California. CBPO Ackley observed a rectangular shaped package concealed in the left rear quarter panel area of the trunk. The vehicle was referred to secondary for further inspection.

34. During the secondary inspection of the vehicle, CBPO K. Gaspar removed a total of eleven (11) packages from the left rear quarter panel, the contents of which contained a white powdery substance that field tested positive for cocaine. The combined weight of the packages was approximately 13.36 kilograms (29.39 pounds).

35. Officers placed Peter ALONZO and Pedro ALONZO RAMIREZ under arrest for violating Title 21 United States Code, Sections 952 and 960, Unlawful Importation of a Controlled Substance. On September 10, 2019, an Indictment was filed in case number 19-CR-3562-JAH charging both defendants with conspiracy to import and importation of cocaine. A trial is set before the Honorable John A. Houston on November 12, 2019.

36. On September 22, 2018, post arrest, Peter ALONZO waived his *Miranda* rights and stated that his son Pedro ALONZO RAMIREZ called him at midnight asking for

AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT
-10-

a ride to Los Angeles, California. Peter ALONZO stated that he was going to Figueroa Street in Los Angeles. Peter ALONZO stated that he had been giving Pedro ALONZO RAMIREZ rides into the United States for work for approximately one week because his son's car wasn't working.

37. Based on the information obtained from his employer, Pedro ALONZO RAMIREZ last worked as a subcontractor doing remodel and handyman projects in the North County area of San Diego in the beginning of September 2018. According to his employer's records, Pedro ALONZO RAMIREZ's last paycheck was on September 8, 2018.

38. Defendants' crossing history indicates that in the week prior to their arrest, Peter ALONZO and Pedro ALONZO RAMIREZ crossed in the vehicle from Mexico into the United States together on September 13, September 17, and September 20, 2018.

39. California Department of Motor Vehicles documents reveal that on August 2, 2018, Pedro ALONZO RAMIREZ registered a 2014 Chevy Camaro with California license plate 8FFV043. According to the DMV records, Pedro ALONZO RAMIREZ purchased the Camaro in June 2018. He first crossed the border in the Camaro on June 21, 2018, at the Otay Mesa POE. Pedro ALONZO RAMIREZ's last border crossing in the Camaro occurred on September 12, 2018, ten days prior to his arrest.

40. Pedro ALONZO RAMIREZ has approximately twenty-five (25) border crossings in the Nissan Sentra prior to his arrest on September 22, 2018. Between June 1, 2018, and the day of his arrest, Pedro ALONZO RAMIREZ had crossed the border approximately 62 times in 3 different vehicles. Pedro ALONZO RAMIREZ's most recent crossings in the Nissan Sentra were on September 20, September 17, September 13, June 8, June 7, June 5, June 2, and June 1, 2018.

41. At the time of their arrest, Pedro ALONZO RAMIREZ was in possession of two cellular phones, and Peter ALONZO was in possession of two cellular phones. Officers seized all four cellular phones incident to their arrest. On January 18, 2019, I applied for,

and Magistrate Judge Linda Lopez signed warrants authorizing to the search of all four phones seized from defendants. *See* 19MJ0254; 19MJ0255; 19MJ0256; and 19MJ0257.

42. One of the phones seized from Pedro ALONZO RAMIREZ was PIN locked, and not supported for PIN bypass or forensic extraction. A search of the other ALONZO RAMIREZ's phone revealed contact and communications with a Mexican phone (M-1) used by an unknown person denoted "Karen." At 4:10 pm on September 21—the day before their arrest—M-1 unsuccessfully tried to call Pedro. Four minutes later, Pedro received a WhatsApp text from the same person (the user name included M-1 in the prefix (i.e., [M-1]@s.whatsapp.net Karen)). The text said, "Pedro … [A]t 6 I will confirm for you for tomorrow; we're a little busy." At 6:10 pm, Karen texted, "Pedro … Everything would be the same for tomorrow; I will wait for your confirmation. Thank you." Pedro's phone had a 69-second call with Karen fourteen minutes later.

43. On October 30, 2019, Pedro ALONZO RAMIREZ's defense team provided an excerpt of Facebook messages between Pedro ALONZO RAMIREZ and "Karen Leyva" sent from the **Target account**. The messages appear to start on September 12, 2018, with Pedro responding to a Facebook Marketplace ad posted by "Karen" about a job that involves bringing jewelry from Los Angeles. The last message provided by defense was from September 16, 2018.

44. As stated above, a forensic download of Pedro ALONZO RAMIREZ's phone revealed contact with the Mexican phone number denoted "Karen" as late as September 21, 2018, the day before the arrest. Based on my training, experience, and investigation, I believe other communications between Pedro ALONZO RAMIREZ and "Karen" or another co-conspirator may exist in the **Target account**.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

45. The United States is unaware at this time of other attempts by the U.S. government to obtain this data by other means.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

46. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Facebook for the relevant accounts and then to analyze the contents of those accounts on the premises of Facebook. The impact on Facebook's business would be severe.

47. Therefore, I request authority to seize all content, including profile contact information, mini-feed, status update history, shares, notes, wall postings, friend listing with friend's Facebook ID, group listing with Facebook Group ID, future and past events, and video listings with filename; User Photos (referred to as User Photoprint); Geo-tags; Group Information; Private Messages; IP Logs; and any other content from the Facebook accounts, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Facebook to make a digital copy of the entire contents of the accounts subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be forensically imaged and the image will then be analyzed to identify communications and other data subject to seizure pursuant to Attachments B-1 and B-2. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

48. Analyzing the data to be provided by Facebook requires special technical skills, equipment and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic

mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. The data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

49. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the segregation and extraction of data will complete the analysis and provide the data authorized by this warrant to the investigating team within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

50. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

51. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

//
//
//
//
//
//
//
//
//
//

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT
-14-

## CONCLUSION

52. Based on the foregoing, I submit that there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 952, 960 and 963, and that the foregoing will be found on the premises searched, as identified in Attachment A.

_____
MIRIAM MARCAIS
HSI Special Agent

Subscribed and sworn to before me this ___1___ day of November 2019

_____
Barbara L. Major
U.S. MAGISTRATE JUDGE

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

Facebook, Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records, and date located at Facebook, Inc., Attn: Security Department/Custodian of Records, 1601 Willow Road, Menlo Park, California 94025.

**ATTACHMENT B**
ITEMS TO BE SEIZED

I. Service of Warrant

The officer executing the warrant shall permit Facebook, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II. Items to be provided by the ISP

All subscriber and/or user information, all electronic mail, images, text messages, histories, phone and VoIP logs, contacts or friend lists, profiles, method of payment, detailed billing records, access logs, backup data, transactional data, and any other files or records associated with the following account and screen name:

Facebook Name: "Pete Jr Alonzo"
Facebook ID No.: 100003184530570
Facebook URL: www.facebook.com/pedro.alonzo.100

III. The search of the data supplied by Facebook, Inc. pursuant to this warrant will be conducted by Homeland Security Investigations as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of June 1, 2018, to September 22, 2018 and to the seizure of:

a. Communications, records, and attachments tending to discuss or establish importation or distribution of controlled substances, or conspiracies or agreements to do so;

b. Communications, records, and attachments tending to identify locations of narcotics being distributed or imported into the United States;

c. Communications, records, and attachments tending to identify Pedro Alonzo-Ramirez, Karen, and any co-conspirators involved in the activities in III(a)-(b) above; and

d. Communications, records, and attachments that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts;

which are evidence of violations of 21 U.S.C. §§ 952, 960 and 963.